UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARK FERGUSON, a married individual, d/b/a WHEW.COM,<br><br>Plaintiff,<br><br>v.<br><br>QUINSTREET, INC., a California corporation; and JOHN DOES, I-CC,<br><br>Defendants. | Case No. C07-5378RJB<br><br>**ORDER ON DEFENDANT QUINSTREET, INC.'S MOTION FOR SUMMARY JUDGMENT AND ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

This matter comes before the Court on Defendant Quinstreet, Inc.'s Motion for Summary Judgment (Dkt. 56) and Plaintiff's Motion for Partial Summary Judgment (Dkt. 59). The Court has considered the pleadings filed regarding these motions and the file herein.

Plaintiff filed this case on July 27, 2007, alleging that, beginning around October 2006, Defendants' various emails violated the Federal CAN-SPAM Act, ("CAN-SPAM"), 15 U.S.C. § 7701, *et. seq.*, the Washington Commercial Electronic Mail Act, ("CEMA"), RCW 19.190.010-.070, and the Washington State Consumer Protection Act, ("CPA"), RCW 19.86. Dkt. 1. All Defendants have been dismissed by stipulation of the parties, with the exception of Defendant Quinstreet Inc. ("Quinstreet") and Defendants John Does. Dkts. 26 (Vision Care Holdings, LLC), 36 (The Bradford Exchange, Ltd.), 38 (Nautilus, Inc.), and 48 (Active Response Group). For ease of reference, this order will refer to Quinstreet, Inc. as ("Defendant").

ORDER
Page - 1

# I. FACTS

## A. BACKGROUND

In order to better understand the issues relevant to this case, some background information on web sites, web pages, and domain names is needed. As most now know, "the Internet is a worldwide network of computers that enables various individuals and organizations to share information." *Panavision International, L.P. v. Toeppen,* 141 F.3d 1316, 1318 (1998). Computer users can access millions of web sites and web pages via the Internet. *Id.* "A web page is a computer data file that can include names, words, messages, pictures, sounds, and links to other information. Every web page has its own web site, which is its address, similar to a telephone number or street address." *Id.* Websites can be "created by any user who reserves an Internet Protocol [IP] address - and does the necessary programming." *Avery Dennison Corp v. Sumpton*, 189 F3d, 868, 872, (9th Cir. 1999). Because an IP address is a string of numbers separated by periods, for ease of recall and use, a user relies on a domain name to reach a given website. *Id.* "The domain name often consists of a person's name or a company's name or trademark. For example, Pepsi has a web page with a web site domain name consisting of the company name, Pepsi, and .com, . . . Pepsi.com." *Panavision* at 1318. Domain names are then registered, and the party who registers the domain name has, in theory, the right to use it. *Id.* A web page's information is stored by a "hosting service computer" or "server." *Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 874 (2002).

## B. RELEVANT EVENTS

Defendant is an online marketing, media and technology services company that attempts to connect consumers with products and services. Dkt. 58, at 2. Defendant graphically designs online advertisements for products and services offered by its clients. *Id.* It prepares the text and graphics, which are incorporated into emails. *Id.* Defendant contracts with a third party publisher ("publisher"), who has a confidential list of email recipients. *Id.* The publisher is not a named defendant here. Defendant asserts that the publisher protects its lists as trade secrets. *Id.* Defendant alleges that the publisher decides which of its lists to use on any given advertisement based upon the publisher's research. *Id.* Defendant states that it,

> [D]oes not know which domain or domains will be used by the publishers to transmit the emails and has no knowledge of or control over the individuals to whom the publisher sends the emails. [Defendant] does not create, see, or approve any domain references in the emails including any domain references in the Header. [Defendant] is advised by the

> publishers that the email advertisements are sent only to e-mail addresses which have opted in or consented to the receipt of emails from a particular domain or domains controlled by the publisher. [Defendant] prohibits publishers from sending emails to those who have opted out or unsubscribed.

*Id.* at 2-3.

Plaintiff is a Washington resident who builds and maintains various web pages. Dkt. 57-2. He began working with a client, Jessica Felix, in the 1990s and continues working for her today. Dkt. 57-2, at 7. He built and maintains a web page for her, www.artandallthatjazz.com. *Id.*, at 7-9. Ms. Felix offers jewelry for sale through her web page. *Id.* Plaintiff does not charge her for his work, and has no other such clients. *Id.* Plaintiff built and maintains other web pages for himself, including Whew.com. Dkt. 57-2, at 34. Plaintiff does not provide email accounts, but has provided "email forwarding" services for friends and family, and to Ms. Felix over the years. *Id.* He does not charge for the service. *Id.* He allows them to use a whew.com email address "in order to get rid of some of their spam." *Id.* Plaintiff describes "email forwarding" as occurring when email goes through his "server at whew.com, and then it is filtered and then it is automatically forwarded to the server where the – or the email account wherever they may be." *Id.*, at 35. He provides "email forwarding" for the orders sent for Ms. Felix's jewelry. *Id.* Plaintiff has control of 29 IP addresses, which are registered to sonic.net. Dkt. 57-2, at 37.

From October 2006 (the time Plaintiff alleges that he began receiving the emails at issue) until the end of 2007, Plaintiff paid a monthly service charge to use a server owned by sonic.net. Dkt. 57-3, at 11 and 18. Sonic.net hosted his websites and the websites for his client. *Id.* Plaintiff began renting a server around February of 2008, which he uses to build, host, and maintain web pages. Dkt. 57-2, at 38; Dkt. 53, at 3. Plaintiff does not work on or maintain the server. Dkt. 57-3, at 3-4. Sonic.net performs those functions. *Id.*

Until January of 2007, Plaintiff's primary connection to the Internet was through sonic.net, at a cost of $18.95 per month for dial-up service for which he used a 56k modem. Dkt. 57-2, at 37. Plaintiff alleges that as a result of all the spam that he was receiving, he purchased broadband service from Advance Stream for $30.00 per month. Dkt. 57-3, at 5-6. His broadband service is provided via cable, and is much faster than the dial-up service. *Id.*

Plaintiff points to nine emails from the Defendant that allegedly violate CAN-SPAM, CEMA, and CPA due to an improper address. Dkt. 60-2, at 3, 8, 13, 17, 21, 25, 29, 34, and 39.

## C. PENDING MOTIONS

Defendant moves for summary dismissal of Plaintiff's claims arguing that: 1) Plaintiff does not have standing to assert claims under CAN-SPAM because Plaintiff is not a provider of internet access service that was adversely affected by its alleged emails, 2) Plaintiff can not establish that Defendant violated CAN-SPAM, 3) Plaintiff can not establish that Defendant violated CEMA because Defendant has no knowledge or control over who receives the emails and the complaint does not allege false or misleading subject lines, and 4) Plaintiff can not establish that Defendant violated Washington's CPA. Dkts. 56 and 66.

Plaintiff responds, arguing that: 1) he meets the definition of a provider of internet access service, 2) he has been adversely affected by the spam, 3) Plaintiff is an "interactive computer service" under the Washington CEMA, and 4) Defendants are responsible for their spam. Dkt. 64.

Plaintiff moves for partial summary judgment on his CAN-SPAM claim, arguing that: 1) Defendant is legally responsible for the emails in question based upon the language of the statue and under agency principles, 2) nine emails violate CAN-SPAM because they do not contain a "valid physical address of the sender," and 3) additional emails were sent after Plaintiff filed suit in violation of CAN-SPAM. Dkts. 59 and 68.

Plaintiff moves for partial summary judgment on his CEMA claim arguing that: 1) despite the use of a third party publisher, Defendant is liable for the emails pursuant to the language in CEMA and under agency principles, 2) Defendant "obscured the point of origin" of nine emails in violation of RCW 19.190.020 (a), and 3) Defendant continues to violate CEMA. Dkts. 59 and 68.

Defendant responds, arguing that: 1) Plaintiff fails to establish that Defendant violated CAN-SPAM, 2) Plaintiff's CEMA claims are preempted by CAN-SPAM, 3) he failed to establish that Defendant violated CEMA, 4) Defendant did not consciously avoid knowing of the alleged statutory violations, and 5) Plaintiff fails to establish that the publishers are Defendant's agents. Dkt. 62.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(b) a "party against whom relief is sought may move at any time, with or without supporting affidavits, for summary judgment on all or part of the claim." Summary judgment is

proper only if the pleadings, the discovery and disclosure materials on file, and affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. *Id*. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     FEDERAL CLAIM UNDER CAN-SPAM**

CAN-SPAM prohibits "false or misleading transmission information:"

It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transaction or relationship message, that contains or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph -
(A) header information that is technically accurate but includes an originating email address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;
(B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be

considered materially false or materially misleading; and
(C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

15 U.S.C. § 7704 (a) (1). CAN-SPAM also prohibits "patterns and practices" of using deceptive subject headings (§ 7704 (a) (2)), of not containing a functioning return electronic mail address (§ 7704 (a) (3)), of sending commercial electronic mail messages after a recipient makes a request not to receive them (§ 7704 (a) (4)), and of failing to include an identification that the message is an advertisement, clearly identify a way to opt-out, and a valid physical postal address of the sender (§ 7704 (a) (5)).

CAN-SPAM limits who may bring an enforcement action to the Federal Trade Commission, other specified federal agencies, and state Attorneys General. 15 U.S.C. § 7706(a), (b), (f). A limited additional private right of action exists, however. CAN-SPAM contains a provision for enforcement by "provider(s) of Internet access service adversely affected" by a violation of section 7704(a)(1), (b), or (d) of the Act, "or a pattern or practice that violates paragraph (2), (3), (4), or (5) of section 7704(a)." 15 U.S.C. § 7706(g)(1). Providers of "Internet access service" are sometimes referenced by Congress and in case law as IASs or ISPs. *See e.g.* S. REP. NO. 108-102, at 6 (2003) (Comm. Rep. on CAN-SPAM Act of 2003 (S.877) and *Gordon v. Virtumundo, Inc.*, *et al.,* 2007 WL 1459395 (W.D. Wash. May 15, 2007). Defendants allege that Plaintiff does not have standing to bring a claims under CAN-SPAM because he is not an "Internet access service" provider, and even if he was a provider, he was not "adversely affected" by the violations alleged.

           1.     Internet Access Service Provider

CAN-SPAM defines "Internet access service" as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services." 15 U.S.C. § 7702(11) (*referencing* 47 U.S.C. § 231(e)(4)).

Congress's attempt at restricting who may enforce CAN-SPAM was, to some extent, undermined by the ambiguous definition used for a provider of "Internet access service." Defendants properly point out that read broadly, "any person who allows another person to use their computer to access the Internet

'enables users to access content, information, electronic mail, . . . over the Internet.'" Dkt. 56, at 9. The Ninth Circuit Court of Appeals has made no decision, published or otherwise, as to who is an "Internet access service" provider under CAN-SPAM. There have been a few quite recent cases that have come from the U.S. District Courts. *See e.g. Gordon v. Virtumundo, Inc.*, *et al.,* 2007 WL 1459395 (W.D. Wash. May 15, 2007), *Brosnan v. Alki Mortgage, L.L.C.*, 2008 WL 413732 (W.D. Wash. May 15, 2007) and *ASIS Internet Services v. Optin Global, Inc.*, 2008 WL 1902217 (N.D. Cal. April 29, 2008). Although not binding authority, they do provide some guidance. In *Gordon v. Virtumundo, Inc.*, *et al.,* 2007 WL 1459395 (W.D. Wash. May 15, 2007), the court reviewed some of the legislative history behind CAN-SPAM's private right of action provision in light of the broad definition of a provider of "Internet access service." The *Gordon* Court noted that "Representative John Dingell stated that the standing provision at issue here 'provides for a limited right of action by bona fide Internet service providers'" and that "'we intend that Internet access service providers provide actual Internet access service to customers.'" *Id.* (*citing* 150 Cong. Rec. E72 and E73 (January 28, 2004). The *Gordon* Court found that the plaintiffs there, who provided Internet content and email, qualified as provider of "Internet access service" under the "statutes capacious definition." *Id.*

Like the *Gordon* plaintiffs, Plaintiff here qualifies as a provider of "Internet access service." He has control of 29 registered domain names. Dkt. 57-2, at 37. He has built and maintains web pages for himself and third parties using unique domain names. Dkt. 57-2, at 7-9, and 34. He provides an email forwarding service for family, friends, and a client. Dkt. 57-2, at 34-35. Through those activities, he enables "users to access content, information, electronic mail, or other services offered over the Internet." 15 U.S.C. § 7702(11). Accordingly, he meets the very broad definition of a provider of "Internet access service" under CAN-SPAM. The next issue to be decided, is whether he was "adversely affected" by the alleged violations.

2. <u>Adversely Affected</u>

The *Gordon* Court reviewed some of CAN-SPAM's legislative history to determine Congressional intent on what constitutes an "adverse effect." It noted that,

> In the Committee Report, under the heading "Costs to ISPs, Consumers, and Businesses," the Senate Committee on Commerce, Science, and Transportation found that spam imposes significant economic burdens on ISPs, consumers and businesses because massive volumes of spam can clog a computer network, slowing Internet service for those who share that

ORDER
Page - 7

'enables users to access content, information, electronic mail, . . . over the Internet.'" Dkt. 56, at 9. The Ninth Circuit Court of Appeals has made no decision, published or otherwise, as to who is an "Internet access service" provider under CAN-SPAM. There have been a few quite recent cases that have come from the U.S. District Courts. *See e.g. Gordon v. Virtumundo, Inc.*, *et al.,* 2007 WL 1459395 (W.D. Wash. May 15, 2007), *Brosnan v. Alki Mortgage, L.L.C.*, 2008 WL 413732 (W.D. Wash. May 15, 2007) and *ASIS Internet Services v. Optin Global, Inc.*, 2008 WL 1902217 (N.D. Cal. April 29, 2008). Although not binding authority, they do provide some guidance. In *Gordon v. Virtumundo, Inc.*, *et al.,* 2007 WL 1459395 (W.D. Wash. May 15, 2007), the court reviewed some of the legislative history behind CAN-SPAM's private right of action provision in light of the broad definition of a provider of "Internet access service." The *Gordon* Court noted that "Representative John Dingell stated that the standing provision at issue here 'provides for a limited right of action by bona fide Internet service providers'" and that "'we intend that Internet access service providers provide actual Internet access service to customers.'" *Id.* (*citing* 150 Cong. Rec. E72 and E73 (January 28, 2004). The *Gordon* Court found that the plaintiffs there, who provided Internet content and email, qualified as provider of "Internet access service" under the "statutes capacious definition." *Id.*

Like the *Gordon* plaintiffs, Plaintiff here qualifies as a provider of "Internet access service." He has control of 29 registered domain names. Dkt. 57-2, at 37. He has built and maintains web pages for himself and third parties using unique domain names. Dkt. 57-2, at 7-9, and 34. He provides an email forwarding service for family, friends, and a client. Dkt. 57-2, at 34-35. Through those activities, he enables "users to access content, information, electronic mail, or other services offered over the Internet." 15 U.S.C. § 7702(11). Accordingly, he meets the very broad definition of a provider of "Internet access service" under CAN-SPAM. The next issue to be decided, is whether he was "adversely affected" by the alleged violations.

2. <u>Adversely Affected</u>

The *Gordon* Court reviewed some of CAN-SPAM's legislative history to determine Congressional intent on what constitutes an "adverse effect." It noted that,

> In the Committee Report, under the heading "Costs to ISPs, Consumers, and Businesses," the Senate Committee on Commerce, Science, and Transportation found that spam imposes significant economic burdens on ISPs, consumers and businesses because massive volumes of spam can clog a computer network, slowing Internet service for those who share that

ORDER
Page - 7

> network. ISPs must respond to rising volumes of spam by investing in new equipment to increase capacity and customer service personnel to deal with increased subscriber complaints. Dictionary attacks can hijack a server, slowing it and making it appear that legitimate users are sending spam, and web bugs communicate back to the spammer from the recipient's computer. Increased costs of anti-spam software are passed on as increased charges to consumers and some observers expect that free e-mail services will be downsized. The Committee also noted that although Internet access through broadband connections is steadily growing, a dial-up modem continues to be the method by which a vast majority of Americans access the Internet and their e-mail accounts. The per-minute and long distance charges for Internet connections for many e-mail users were exacerbated by time spent on manual spam filtering, resulting in additional per-customer costs.

*Gordon* at 11(*citing* S. REP. NO. 108-102, at 6 (2003) (Comm. Rep. on CAN-SPAM Act of 2003 (S.877)). The *Gordon* Court noted that the harms enumerated by Congress went "well beyond the consumer-specific burden of sorting through an inbox full of spam. These harms to IASs or ISPs relate to network functioning, bandwidth usage, increased demands for personnel, and new equipment needs, which eventually cost consumers." *Gordon,* at 12 (*citing* S.Rep. No. 108-102, at 6). The Court concluded that in order to have standing under CAN-SPAM, the "adverse effect" to an entity must be both real and of the type uniquely experienced by providers of Internet access services. *Id*. This Court agrees, "any other reading would expand the private right of action beyond what Congress intended." *Id*.

Turning to the case at bar, Plaintiff has not shown that he has suffered the "adverse effect" that Congress intended to address. Plaintiff has not shown that he has problems related to network functioning during the relevant time. S. REP. NO. 108-102, at 6-8 (2003) (Comm. Rep. on CAN-SPAM Act of 2003 (S.877). He does not own a server, but, at best, rents server space. He does not maintain or repair the servers or directly employ any one who repairs or maintains the servers. Any network harm that may result from the emails would likely be borne by Sonic.net. He has not shown that he had to invest in "new equipment to increase capacity," or new software due to the emails. *Id.* He has made no showing that he had to hire "customer service personnel to deal with increased subscriber complaints." *Id*. Plaintiff has only shown that he has chosen to switch from a dial up connection (at $18.95 per month) to a broadband connection (at $30.00 per month), a connection which he acknowledges is much faster. This negligible harm is insufficient to establish the "adverse effect" Congress intended to address.

### 3. Conclusion

Plaintiff does not have standing under CAN-SPAM because he is not a provider of "Internet access service" who was "adversely affected" by the emails. This claim should be dismissed. To the extent that Plaintiffs move for summary judgment on this claim, the motion should be denied.

### C. WASHINGTON LAW CLAIM UNDER CEMA

CEMA provides,

> No person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that:
> (a) uses a third party's internet domain name without permission of the third party, or otherwise misrepresents or obscures any information in identifying the point of origin or the transmission path of a commercial electronic mail message; or
> (b) contains false or misleading information in the subject line.

RCW 19.190.020(1). RCW 19.190.020(2) provides that "a person knows that the intended recipient of a commercial electronic mail message is a Washington resident if that information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address."

Plaintiff argues that there are nine emails before the Court which contain the address 222 Grace Church Street #302-100123, Port Chester, NY 10573, which Plaintiff asserts is the street address for the municipal government of the Village of Port Chester New York. Dkt. 60-2, at 3, 8, 13, 17, 21, 25, 29, 34, and 39. Plaintiff argues that Defendant has therefore "misrepresent[ed] or obscur[ed]" information in identifying the point of origin of the subject emails in violation of CEMA. Dkt. 59, at 4.

### 1. Preemption

Defendant asserts that Plaintiff's CEMA claim is preempted by CAN-SPAM citing *Omega World Travel, Inc. v. Mummagraphics, Inc.,* 469 F.3d 349 (4th Cir. 2006). Dkt. 62, at 7. There is no Ninth Circuit authority on whether Plaintiff's claim under the provision of CEMA prohibiting "misrepresent[ing] or obscures[ing] any information in identifying the point of origin" is preempted by CAN-SPAM.

CAN-SPAM's preemption clause provides,

> This chapter supersedes any statue, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

15 U.S.C. § 7707 (b)(1). In order to determine whether a provision of a state statute is preempted by a

ORDER
Page - 9

federal statute, the court must first identify the domain expressly preempted by that language. *Air Conditioning and Refrigeration Institute v. Energy Resources Conservation and Development Com'n,* 410 F.3d 492, 495 (9th Cir. 2005)*(internal citations omitted)*. Inquiry into the scope of a preemption clause is guided by two presumptions. *Id.* First, is the assumption that Congress did not intend to displace state law. *Id.* Second, is the assumption that the "centerpiece of any preemption analysis is congressional purpose." *Pacific Gas and Elec. Co. v. California, ex rel, et al.,* 350 F.3d 932, 942 (9th Cir. 2003)*(internal citations omitted)*. To determine congressional purpose, examination of the "statute's language, structure, subject matter, context, and history" are factors that "typically help courts determine a statute's objectives and thereby illuminate its text." *Id.*, at 943. Since preemption claims turn on Congress's intent, the analysis begins, as always when doing an exercise of statutory construction, "with the text of the provision in question." *Air Conditioning and Refrigeration Institute,* at 495. This analysis applies to cases where the entire state statute is alleged to be preempted, as well as to allegations that only particular claims within that structure are preempted. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996).

CAN-SPAM's broad preemption clause contains a savings clause for state statutes that prohibit "falsity or deception" in a commercial email. 15 U.S.C. § 7707 (b)(1). "Falsity or deception" are not defined in CAN-SPAM. Accordingly, those words should be given their ordinary meaning. *Emmert Indus. Corp. v. Artisan Assocs., Inc.,* 497 F.3d 982, 987 (9th Cir. 2007) . The Fourth Circuit, in *Omega World Travel, Inc. v. Mummagraphics, Inc.,* 469 F.3d 349 (4th Cir. 2006), reviewed the ordinary meaning of these terms as used in this provision of CAN-SPAM. Though not binding authority, this case may offer some guidance on the questions faced here. The *Omega* Court noted that "'deception' requires more than bare error, and while 'falsity' can be defined as merely 'the character or quality of not conforming to the truth or facts,' it also can convey an element of tortiousness or wrongfulness, as in 'deceitfulness, untrustworthiness, faithlessness.'" *Id.* (*citing Webster's Third New International Dictionary Unabridged* 820 (1971); and *Oxford English Dictionary Vol. V* 697 (2d ed.1989) (defining false as "erroneous, wrong," but also as "mendacious, deceitful, treacherous," and "[p]urposely untrue"); and *Black's Law Dictionary* 635 (8th ed.2004) (defining "false" as "untrue" but also as "deceitful; lying")). The *Omega* Court further found,

> Reading "falsity" as referring to traditionally tortious or wrongful conduct is the interpretation most compatible with the maxim of *noscitur a sociis,* that a word is generally

> known by the company that it keeps. The canon applies in the context of disjunctive lists. Here, the preemption clause links "falsity" with "deception"-one of the several tort actions based upon misrepresentations. This pairing suggests that Congress was operating in the vein of tort when it drafted the preemption clause's exceptions, and intended falsity to refer to other torts involving misrepresentations, rather than to sweep up errors that do not sound in tort.

*Id.*

CEMA does not define "misrepresent" or "obscure." The Washington State Court of Appeals, Division II, examined the meaning of CEMA's terms "misrepresent" and "obscure" in *Benson v. Oregon Processing Service, Inc.*, 136 Wash. App 587, 592 (2007). The *Benson* Court noted that "Webster's Third New International Dictionary defines "misrepresent" as "representing incorrectly: to give false, imperfect or misleading representation." *(quoting* Webster's Third New International Dictionary at 1445 (2002)). The *Benson* Court went on to define "obscure" as "to conceal or hide from view as by or as if covering wholly or in part: make difficult to discern." *Id. (quoting* Webster's at 97). Thus defined by Washington courts, the term "misrepresent" does not necessarily contain a knowledge requirement. That is, it appears that a sender of commercial email could be potentially held liable under the statute for unintentional clerical errors. "Falsity" and "deception," in contrast, do not appear to include situations were "bare error has occurred." *See Omega* at 354.

This interpretation is supported by Congressional findings on the subject. Congress expressed concern for balancing the interests of avoiding the cost of spam and those of "law abiding businesses." *See* S. REP. NO. 108-102, at 6 (2003) (Comm. Rep. on CAN-SPAM Act of 2003 (S.877) and 15 U.S.C. § 7701(a)(11). Congress found that,

> Many States have enacted legislation intended to regulate or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements. As a result, they do not appear to have been successful in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic email address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these disparate statutes they are required to comply.

15 U.S.C. § 7701(a)(11). "Rather than banning all commercial e-mails or imposing strict liability for insignificant inaccuracies, Congress targeted only e-mails containing something more than an isolated error." *Omega*, at 354. Accordingly, to the extent that CEMA's provision, which prohibits "misrepresent[ing] or obscures[ing] any information in identifying the point of origin" of an email, includes "bare error," it is preempted by CAN-SPAM.

In deciding whether Plaintiff's CEMA claim is preempted by CAN-SPAM, then, Plaintiff must

ORDER
Page - 11

show a triable issue of fact on whether the addresses at issue are incorrect, and whether the inaccuracy was due to more than "bare error." The evidence in the record shows that the nine subject emails do contain the address 222 Grace Church Street #302-100123, Port Chester, NY 10573. Dkt. 60-2, at 3, 8, 13, 17, 21, 25, 29, 34, and 39. There is evidence in the record that the municipal government of the Village of Port Chester New York uses the address of 222 Grace Church Street, Port Chester, NY 10573. Dkt. 60-4. The record also shows that this is a building with multiple suites. Dkt. 63, at 19. There is evidence in the record that "My U.S. Postbox," a company which purports to provide postboxes for the receipt of letters and small parcels, provides its customers an address of 222 Grace Church Street #302. Dkt. 67-8. Even viewing the evidence in a light most favorable to the Plaintiff, the record is insufficient to show more than "bare error," in the addresses listed on the subject emails, if that. Plaintiff has failed to show that there are genuine issues of material fact as to whether the subject emails "misrepresent[] or obscure[] any information in identifying the point of origin." RCW 19.190.020(1). The *Gordon* Court came to a similar conclusion on the CEMA claims before it. Like the *Gordon* Court, this Court finds that while claims actually alleging falsity or deception under CEMA would not be preempted, Plaintiff's claims here - for at best incomplete or less than comprehensive information - are for immaterial errors that may not be litigated under state law. *Id.*, at 20.

2. Conclusion

Plaintiff's claim under CEMA is preempted by CAN-SPAM. Plaintiff's claim under CEMA should be dismissed. Plaintiff's Motion for Partial Summary Judgment on his CEMA claims should be denied as moot.

**D. WASHINGTON LAW CLAIM UNDER CPA**

To prevail on a CPA claim, a private plaintiff must show: "(1) an unfair or deceptive act or practice, (2) that occurs in trade or commerce, (3) a public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act and the injury suffered." *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.,* 162 Wash.2d 59, 75 (2007) (*internal citations omitted*). A private plaintiff must satisfy all five elements to prevail. *Id.* Under RCW 19.190.030(1), it is a violation of the Washington CPA to violate RCW 19.190.020.

Plaintiff's CPA claim is based upon a violation of CEMA. Dkt. 1. Plaintiff's CEMA claim is pre-

empted by CAN-SPAM. Accordingly, Plaintiff's CPA claim is also preempted by CAN-SPAM. This claim should be dismissed. To the extent Plaintiff moves for summary judgment on this claim, it should be denied.

### III  ORDER.

Therefore, it is hereby, **ORDERED** that

- Defendant Quinstreet, Inc.'s Motion for Summary Judgment (Dkt. 56) is **GRANTED**
- Plaintiff's claims are **DISMISSED**,
- Plaintiff's Motion for Partial Summary Judgment (Dkt. 59) is **DENIED**; and
- This case is DISMISSED.
- The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 5th of August, 2008.

_____
ROBERT J. BRYAN
United States District Judge